### DAYTON RUBBER MFG. CO. et al. v. STAGNARO et al.

#### No. 6934.

Circuit Court of Appeals, Sixth Circuit.

Nov. 9, 1938.

Rehearing Denied Feb. 14, 1939.

H. A. Toulmin, Jr., of Dayton, Ohio (H. A. Toulmin and H. A. Toulmin, Jr., both of Dayton, Ohio, on the brief), for appellants.

E. S. Allen, of Cincinnati, Ohio, and Edwin S. Clarkson, of Washington, D. C.

(Edwin S. Clarkson, of Washington, D. C., Humbert B. Powell, of Philadelphia, Pa., and Allen & Allen, of Cincinnati, Ohio, on the brief), for appellees.

Before HICKS, ALLEN, and HAMILTON, Circuit Judges.

HICKS, Circuit Judge.

Suit by appellants against L. H. Gilmer Company, a belt manufacturer, and against Henry Stagnaro and others, trading as Cincinnati Belting Company, a sales distributor, for infringement of Patent No. 1,538,303, issued May 19, 1925, to Charles R. Short. The validity of the Short patent is conceded and the issue here is that of infringement only. This involves the scope of the Short claims, all sixteen of which are in issue with the exception of Claim 12.

The Short patent is for a "Transmission Belt" and is in the field of V-shaped transmission belts. The automobile fan belt is a familiar example. It may be noted that the designation of these belts as "V-shaped" is somewhat misleading since in cross-section they are trapezoidal in shape. The inner and outer surfaces are parallel and the sides are cut at angles to fit the grooves in pulleys.

Such belts are constructed of rubber composition, fabric and other materials, and Short stated in his specification that the earlier ones had been "relatively short-lived because of a large amount of rubber employed which generates heat under flexure, the poor transmission of this heat to the outside of the belt, uneven wear on the pulley engaging surface, and the longitudinal stiffness of the belts." He designed his belt to "overcome these difficulties and to promote the life of the belts." Such belts operate upon pulleys and in bending around the pulley the side nearest it contracts, the side on the outer circumference stretches, and in between is a medial layer merging into the other two, which theoretically never contracts nor stretches. These three areas are well recognized in the art as the "compression zone" next to pulley, the "neutral axis" and the "tension zone" at or near the outside. If the materials of which the inner and outer layers are constructed are too unyielding longitudinally, the strains developed as the belt passes around the pulley would cause the materials to tear or break and render the belt useless. If the materials of the neutral axis are too flexible, the belt would stretch and slip unduly and lose power. If the three zones were too compressible laterally, the belt instead of bridging the V of the pulley and maintaining its sides in frictional contact therewith, would be squeezed to the bottom of the pulley and lose tractive power. Short claimed that if the belt had too much rubber in it the heat generated therein by the continued flexing in operation would cause the belt to deteriorate rapidly.

The ideal belt, then, would be flexible in its inner and outer layers, non-stretchable in its medial layer and transversely rigid so far as possible in all three layers; and according to Short's teaching, would use as little rubber as possible.

In his preferred belt, Short formed the medial portion of layers of straight-laid, square-woven fabric of tight weave to avoid any material stretching under tension when in use. This part of the belt, thus lying in the neutral axis, was designed to carry the greater part of the power load, and the number of plies of fabric used therein varied according to the strength desired; but he preferred "to use as few layers as possible in order to avoid an elongation or contraction of these plies when the belt is bent on a short radius."

The compression and tension zones were composed of four layers each of "loosely woven strips * * * which yield longitudinally during the movement of the belt over a pulley, but which preferably resisted compression crosswise of the belt due chiefly to the transverse threads * * *." The tighter the cross-threads were twisted the greater would be their resistance to compression under the wedging action of the pulley flange. This is important, for though the neutral axis actually pulls the load, the pull must be imparted through the sides of the belt, where they come in contact with the pulleys.

Short noted in his specification that the longitudinal threads might be woven in varying degrees of looseness to give more or greater flexing properties to the compression and tension layers; and also "that the use of a *bias cut fabric* in a belt to obtain the longitudinally yielding structure is *well known*." (Italics ours.)

His specification recites that "the layers of fabric are secured together by bonding material such as a rubber-composition which may be applied to the separate lay-

ers as a skin coating. * * *" Short outlined two methods of forming his belts. In the first, wide strips of the material were wound on a drum and bonded together. The drum was then rotated and the belts were cut off by forcing a knife down through the layers at an angle to the axis of the drum. This gave them the V-shape. In the second, where each belt was molded separately, "some of the rubber composition may be forced on to the wearing surface of the belt. The amount of rubber-composition employed is preferably so chosen that the *skin coating thus formed on these surfaces is very thin so it will wear away quickly and leave the ends of the cross-threads exposed."* (Italics ours.)

The specifications state further: "The cross-threads in the various fabric plies conduct the heat to the belt surfaces more rapidly than does the rubber and so reduces the temperature of the belt. * * * The use of a large number of contractible and extensible layers of fabric also reduces the amount of rubber required in the belt and the quantity of heat generated as the fabric layers give to a large extent the yielding properties which heretofore have been obtained largely by rubber content. * * *"

In the specification Short emphasized the effects of the cross-thread construction by saying that "owing to the fact that the cross-threads resist transverse compression, the belt will have a substantially uniform cross-sectional shape when bent over a pulley and will present a uniform friction surface extending substantially the full depth of the belt. The small contractions of the inner belt plies and the slight extension of the outer plies during flexure are graduated from the neutral axis of the belt so that when the belt is bent the bent portion has a trapezoidal shape and an outward bowing of the medial portion is avoided. This gives the belt a large frictional contact with a pulley insuring * * * high speed with minimum wear."

In the District Court the parties agreed that the plaintiff therein would "identify and stipulate the belt construction sold by the defendant, the Cincinnati Belt Company, which it is alleged infringes the designated claims in the patent. It is further stipulated that defendants agree that the sample belt is typical of the belts which they have made, used and sold in this district."

Exhibit 4, which was a small section of belt, was so designated as "the belt manufactured, used and sold within the jurisdiction of the court preparatory to the bringing of the Bill of Complaint * * *" which infringed "Claims 1 to 11 inclusive and 13 to 16 inclusive of the Short patent in suit * * *."

The center of Exhibit 4 consisted of longitudinal reinforcing cords laid roughly in layers. They were not woven into a fabric, but were embedded solidly in rubber or rubber composition; there were no cross-threads. The compression zone had a layer of tough wear-resisting rubber. Immediately outside the cords, in the tension zone, was more wear-resisting rubber and then one layer of extensible bias-laid fabric. Then came more of the rubber.

As stated in one of the Gilmer advertisements, fabric and cord were "vulcanized into one solid, fused-in mass." On three sides, omitting the outer circumference and just under the cover, was imbedded a single layer of thin, bias-cut fabric, apparently rubberized and of exceedingly tough material. The whole was incased in a cover of the same material and cut, and single layered, except that it lapped on the side of the outer circumference.

But appellants insist that the carcass of the belt is the important thing, and that the Gilmer belt had a useful life after the cover had worn through, and even then would infringe certain claims. It is necessary to examine the elements of the carcass of the Short belt in view of the prior art.

Appellants concede that other inventors had recognized that all belts tend to separate into the three longitudinal zones hereinabove pointed out. See Patent No. 1,165,780 to Jappe, 1915, and Patent No. 1,400,539 to Gates, 1921. Gates principally used longitudinal cords and a bias-laid rubberized woven fabric whose warp and woof were diagonal to the length of the belt. Gates said that he might "employ rubberized *woven fabric in which one set of threads extends in the direction of the length of the belt* since this element of the belt will then become substantially non-elastic and will perform virtually the same function as the convolution or convolutions of cord. This element of the belt *whether composed of cord or fabric,* will form the neutral axis of the belt, or the portion which does not stretch when the belt is in use." (Italics ours.)

Gates did not perceive the possibility of the use of the transverse threads of his woven fabric to resist compression on the sides of the belt but he did disclose the very material upon which Short later relied and he recognized that his construction did produce some transverse firmness, for in speaking of the compression zone he said: "This compression of the inner portion of the belt produces a widening or enlargement of the outer face of the belt and causes its inclined sides to grip the adjacent walls of the grooved pulley more tightly, thus preventing the possibility of slipping."

The Short belt was designed around the use of certain materials, the function of every one of which, except the strengthening and heat conducting properties of the transverse cords, was known to the art. He does not claim to have developed any new materials. He used old,—and in doing so produced a sturdy belt with an excellent sales record, but there was nothing revolutionary about it entitling it to a wide range of equivalents.

Claim 4 is perhaps typical of the first five in suit. It reads: "4. A transmission belt having a plurality of layers of substantially non-stretchable fabric; and a plurality of layers of circumferentially yielding fabric, the wearing surfaces of the belt consisting partly of the ends of cross-threads in the fabric."

It is clear from what we have said that Exhibit 4 did not have "wearing surfaces * * * consisting partly of the ends of cross-threads * * *", even after its cover had worn through. The only threads which could possibly be exposed would be the longitudinal cords or the ends of the bias fabric strip; but no layers of fabric with cross-threads.

Claims 6 and 7 cover the heat dissipating qualities of the cross-threads. Since Exhibit 4 had no cross-threads, and since its fabric cover was insulated from the center of the belt, it had none of the heat dissipating qualities of Short.

Taking Claims 8, 9, 11 and 13, together, the inextensible portion of Exhibit 4 did not consist of "layers * * * of fabric," its central portion being made up of cords.

Claim 10, because of its general wording, most nearly covers Exhibit 4, assuming it has a useful life after its cover wears down. It reads: "10. A V-shaped, raw-edged transmission belt consisting of parallel flat layers of fabric and a primary binder of vulcanized rubber and having substantially non-stretchable tension members disposed circumferentially in its medial portion, said members extending substantially across the belt; and layers of square woven bias-laid filler fabric on the inside and outside of the medial portion, said layers yielding longitudinally to tension and compression."

Exhibit 4 was not raw-edged; but minus its cover, it had nothing resembling "parallel, flat layers of fabric."

Claims 14, 15 and 16 provide for a *temporary coating of rubber* on the raw edged driving surface of the belt. In the light of the whole specification and the part we have quoted relating to the subject, it is clear this was really no covering at all, and the claims were included simply to cover those belts which, if they were individually made, might come out of the molds with a thin coating of rubber clinging to their sides. It was non-functional, and was expected to wear off very soon, exposing the raw edges, and was not the tough permanent covering of Gilmer.

We conclude that Exhibit 4 does not infringe any of the claims in suit.

The decree is affirmed.